**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE BARNES** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 C 3850 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN,** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff George Barnes ("Plaintiff" or "Barnes") seeks judicial review of a final

decision of Defendant Carolyn Colvin, the Commissioner of Social Security

("Commissioner"). The Commissioner denied Plaintiff's application for disability insurance

benefits and supplemental security income benefits in a February 10, 2012 written decision

issued Administrative Law Judge ("ALJ") Rebecca LaRiccia. Barnes appealed the ruling

to this Court and filed a Motion for Summary Judgment that seeks to reverse the

Commissioner's decision. The Commissioner filed a cross-motion. The Court has

carefully reviewed the short administrative record but omits a detailed description of it. The

parties have carefully outlined the record in their briefs and are thoroughly familiar with the

relevant evidence. For the reasons discussed below, Plaintiff's motion is granted, and the

Commissioner's motion is denied.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is

disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to

Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

**B.** **Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

Applying the familiar five-step analysis, ALJ LaRiccia found at Step 1 that Barnes

had not engaged in substantial gainful activity since his alleged onset date of June 3, 2008. She concluded at Step 2 that he had the severe impairments of bipolar disorder, anxiety, diabetes, obesity, and arthritis. None of the impairments were found to meet or equal a listing at Step 3. Before moving to Step 4, the ALJ concluded that claimant was not entirely credible. She also assessed his RFC as light work with several exertional and non-exertional restrictions. These included only carrying out "simple routine tasks with non-collaborative interaction with coworkers, superficial contact with the general public, and occasional interactions with supervisors." (R. 29). The ALJ found at Step 4 that Barnes could not perform his past relevant work. Based on the testimony of a vocational expert ("VE"), the ALJ concluded at Step 5 that jobs existed in the national economy that Barnes could perform. She thus concluded that he was not disabled.

Barnes argues that the ALJ incorrectly assessed (1) his credibility, (2) the weight to be given to his treating psychiatrist, and (3) his RFC. The Court addresses each of these in turn.

## II. Discussion

### A. The Credibility Issue

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors

that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

The ALJ used standard boilerplate language to find that Barnes' statements concerning the intensity and limiting effects of his symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 32). The Court does not discuss the parties' claims concerning this statement. Courts have consistently held that such language explains nothing meaningful about a claimant's credibility. This Court fully agrees. However, that does not necessarily require remand. The more important issue is how the ALJ went about determining why Barnes was not credible.

That question is not easily answered because the ALJ never addressed the issue directly. She appears to have assessed credibility as part of her finding that Barnes' impairments had not "precluded him from all competitive work." (R. 35). Her reasoning raises several serious problems. As the ALJ recognized, Barnes suffers from bipolar disorder. She thought that he was not credible based on several aspects of his medical treatment for that problem, beginning by finding that a gap existed in Plaintiff's mental health treatment in 2010.

That was an erroneous ground for discounting Plaintiff's credibility. The ALJ did not explain why Barnes' intermittent treatment made him less credible. Social Security Ruling

5

96-7p is clear that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide[.]" The ALJ never asked Barnes to explain the reason for what she believed was inconsistent treatment. *See Orienti v. Astrue*, 958 F. Supp.2d 961, 977 (N.D. Ill. 2013) ("ALJs have a duty to consider factors like inability to travel, mental illness, or economic constraints that may have prevented claimants from seeking [or] receiving medical care."). The record shows that Barnes might not have been able to afford the kind of treatment the ALJ thought he should have sought. A treatment note states that he "can't afford Ecker [Mental Health Center]." (R. 299). Barnes also told the ALJ that he did not have insurance for all of his physical needs. (R. 69). Perhaps he also lacked sufficient insurance to cover mental health treatment in 2010. The ALJ should have clarified the matter before construing lack of treatment against Barnes.

The issue was particularly pressing in this case because of Barnes' bipolar disorder. The ALJ never considered whether his mental illness played a role in what she construed as episodic treatment. Courts have been very clear that an ALJ must account for the effect that mental illness may have on a claimant's treatment history. The Seventh Circuit has emphasized that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from . . . submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Schlichting v. Astrue*, 11 F. Supp.3d 190, 207 (N.D.N.Y. 2012) ("[F]aulting a person with diagnosed mental illness for failing to pursue mental health

6

treatment is a 'questionable practice.'") (citing cases); *Sparks v. Barnhart*, 434 F. Supp.2d 1128, 1135 (N.D. Ala. 2006) ("Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment.") (citing cases). The ALJ should have asked Barnes about his lack of treatment during 2010 before concluding that it undermined his credibility. The Court notes that the Commissioner does not defend the ALJ's decision on this issue.

The Commissioner is also silent concerning the ALJ's belief that the record did not support what she characterized as Barnes' allegations of "vague manic symptoms." (R. 35). He told the ALJ that his manic episodes had improved during the past two years with medication. He also described his symptoms as consisting primarily of fast talking and racing thoughts. (R. 55). The record supports those allegations. A December 2010 Comprehensive Mental Health Assessment from the Ecker Center identified six symptoms as part of Barnes' "manic cluster." These included unstable mood, irritability, impulsivity, decreased sleep, racing thoughts, psychomotor agitation, and impulsive behaviors leading to negative consequences. (R. 386). Psychiatrist Dr. Miljen Jagodic also noted that Plaintiff suffered from "racing thoughts." (R. 410). The ALJ never explained why this does not support what Barnes actually said at the hearing.[1]

The ALJ thought that Barnes was less credible because he frequently changed or discontinued medications without permission from his doctors due to their side effects. (R.

---

[1] The ALJ's focus on Barnes' manic episodes is puzzling in light of the fact that she did not consider his depressive symptoms as part of her credibility discussion. He told the ALJ that these episodes come on him about once a month. During these periods he has an impulse to cut himself and to lash out at others in anger. The record strongly supports the anger claims. Dr. Eva Kurilo also reported that Plaintiff "had some self-mutilating behavior." (R. 270).

35). That was erroneous because the ALJ overlooked her own line of questioning at the hearing on this issue. Barnes told her that he changed his medications because their side effects triggered strong negative emotions for him. He stated: "I get scared and I go off the medicine. Kind of paranoid with the medication. And then after [my] family talks to me and the doctor, then I'll try it again and I'll go back on it." (R. 56). The ALJ never considered this testimony in her decision. *See Hunt v. Astrue*, 889 F. Supp.2d 1129, 1145 (E.D. Wis. 2012) ("ALJs are also required to consider reasons why a claimant might not be complying with prescribed treatment."). The record clearly shows that Barnes was not only concerned about side effects, he was also unusually sensitive to them. (R. 285, "[H]e tends to be very sensitive to side effects from medications"). Social Security Ruling 96-7p obligated the ALJ to consider this issue before concluding that changes in medications worked against Barnes' credibility. *See* SSR 96-7p ("The individual may not take prescription medication because the side effects are less tolerable than the symptoms.").

Equally important, an ALJ must approach issues such as treatment and medication with caution when a claimant has a mental illness. Changes in medication, or sporadic compliance with a prescribed treatment, is not necessarily a sign that a claimant is not credible. That is because "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). *See also Kangail*, 454 F.3d at 630 (noting that bipolar disorder may prevent a claimant "from taking her prescribed medicines"); *Spiva v. Astrue*, 628 F.3d 346, 351(7th Cir. 2010) (stating that referring to a failure to take medications "ignores one of the most serious problems in the treatment of mental illness – the difficulty of keeping patients on

their medications"); *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (explaining that courts "have recognized a mentally ill person's noncompliance with psychiatric medications ca be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (internal marks omitted) (citing cases). None of Plaintiff's psychiatrists thought that changes in his medication regime suggested that his symptoms were less serious than he claimed. The ALJ was required to consider the relation between Barnes' illness and his behavior more carefully before concluding that his actions undermined his credibility.

Barnes testified that his problems with interpersonal relations made it unusually hard for him to sustain a job. The ALJ doubted that was true because Plaintiff "had recently been talking to a girl." (R. 35). The Court cannot follow the logic of this unusual statement. The ALJ never explained what Barnes' interaction with this unnamed girl involved, or why it made his testimony less credible. She also took no account of the content of their conversation. Barnes described their talk in some detail as follows:

> She asked me and we counted something like 12 different police stations I've been arrested from anything when I was younger getting in trouble. Authority, I never liked authority. I fled and eluded three towns with a car one time. I got in trouble for that. I got in trouble for fighting in Wheaton. There was a time I got in a fight with a guy. I got in a fight at Vouts [ ] specialists. . . . I used to work there in '95. That's how I got fired with my boss.

(R. 63-64). It is very difficult to understand how a conversation about Plaintiff's violence and job loss could be evidence that Barnes was capable of working on a full-time basis. Common sense suggests that a person who engaged in the type of behavior that Barnes discussed with the girl in question would also be subject to the kind of social difficulties that Plaintiff told the ALJ he experienced. The ALJ did not explain how the mere fact that

9

Plaintiff was able to talk to another person was sufficient to counter-balance such an inference.

The ALJ also relied on the fact that Barnes had been in a long-term relationship with his girlfriend. Once again, however, she did not draw any logical link between that fact and her conclusion that Barnes' statements about his social problems were not fully credible. The girlfriend told the ALJ in a letter that Barnes was impulsive and violent. She stated that he "put a baseball bat threw [sic] my closet door [and] ripped of[f]] my screen door out of rage." (R. 255). Barnes threatened to throw his cell phone in the face of a customer representative, and stated that he would break all the glass in the store. He tried to jump out of moving car. (Id.). Barnes had also been arrested for harassing his girlfriend, and had been verbally and physically abusive towards his ex-wife. (R. 33, 34).

The ALJ never discussed why the abundant evidence of Barnes' interpersonal aggression did not undermine her finding. The fact that Barnes sustained a personal relationship is not necessarily evidence of his ability to work. The dynamics of a work environment are not the same as a personal relationship. Plaintiff's girlfriend may have been willing to endure Barnes' impulsiveness and violence for periods of time. That is fundamentally different from concluding that an employer would do so. Almost any one of the behaviors that Barnes and his ex-girlfriend described would almost certainly be a basis for termination in most work settings. If Barnes' and his girlfriend's statements (which the ALJ did not assess) were only partially credible, the ALJ should have said so and given her reasons.

Moreover, the record is replete with testimony concerning Plaintiff's impulsive violence. He told the ALJ that "anyone who upsets me I want to hurt and kill." (R. 256).

He stated that in his past jobs he would either fight, get in a conflict, "or I would walk off before I hurt someone. I would just quit the job. So I've quit a lot of jobs in the past." (R. 64). The ALJ did take note of Plaintiff's general claims, including the fact that he only goes grocery shopping at 1:00 a.m. in order to avoid other people. That was because Barnes gets into altercations with others, including a man who bumped up against him in the checkout line. (R. 70, "I said . . . [q]uit that shit or I'm going to knock [your] ass out. And he came outside and threw the bag down and we got into a fight out there.").

The problem is that the ALJ did not address the credibility of these statements in a meaningful way. She must have found some of them credible because she stated that she had "considered" Barnes' anger issues and had accommodated them in the RFC. (R. 35). That, of course, is an RFC finding, not a credibility analysis. The credibility discussion merely states that (1) Barnes is not "completely unable to interact with others" because he was pleasant to his therapists, and (2) he can work because "he has been able to maintain employment in the past." (R. 35).

Both of these reasons are inadequate. The ALJ never discussed why Barnes' behavior towards his therapists was evidence of his capacity to interact with co-workers. The distinction between a therapeutic setting and a work environment required some discussion if the ALJ intended to equate them. Even if her finding were justified, moreover, the fact that Barnes was not "completely unable to interact with others" does not show that his testimony was not credible. Plaintiff never said that he had *no* capacity at all for interacting with other people. He stated, and the evidence strongly suggests, that he had significant problems in doing so. The ALJ should have explained why her extremely limited conclusion was sufficient to rebut what Barnes in fact told her.

The ALJ's belief that Barnes could work now because he was able to work in the past is also without merit. The point of Barnes' disability claim is that, unlike during his past employment, he now has a disability that allegedly began on June 3, 2008. The ALJ found at Step 1 that Barnes had not been gainfully employed since that date. She was required to discuss the basis of her reasoning more fully if she actually intended to rely on pre-onset work to explain why Barnes could work full time now. *See* SSR 83-20 ("The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations.").

Finally, the ALJ relied on two aspects of the medical record. She noted that the record did not contain documents supporting Barnes' claim that he had been hospitalized in August 2010. That is true, though it is insufficient to overcome the ALJ's other errors in reasoning. Part of those errors include her finding that Barnes was not credible because notes from his mental status exams stated that he was "stable." Courts have repeatedly held that "a person can have a condition that is both 'stable' and disabling at the same time." *Hemminger v. Astrue*, 590 F. Supp.2d 1073, 1081 (W.D. Wis. 2008); *see also Hunt*, 889 F. Supp.2d at 1144; *Shell v. Colvin*, 2013 WL 5257830, at *13 (N.D. Ind. Sept. 16, 2013); *Davisson v. Astrue*, 2011 WL 2461883, at *10 (N.D. Ohio June 17, 2011). This Court agrees with this reasoning. "Stable" only signifies that Barnes' condition remained the same over a period of time. It does not address the level of what his condition was. Plaintiff could have been "stable" and non-functional, or "stable" and fully functional. The ALJ never took the additional step necessary to explain why Barnes' "stable" condition undermined his credibility.

For all these reasons, Plaintiff's motion is granted on the credibility issue.

## B.    The Medical Expert Issue

An ALJ is required to evaluate every medical opinion in the record.  20 C.F.R. § 404.1527(d).  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do.").  The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence.  20 C.F.R. § 404.1527(d)(1)-(6).  The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision.

Barnes' treating physician Dr. Syed Anwar submitted a Mental Impairment Questionnaire stating that Barnes had difficulty in concentration, was hostile, and experienced mood swings.  He assessed the current GAF score at 35 and found that Barnes' highest level in the past year was 40.  Dr. Anwar believed that Barnes would need to miss work more than three times a month because of his limitations.  He also identified a marked restriction in social functioning, repeated episodes of decompensation, and concluded that Plaintiff would have a poor or no ability to perform a number of unskilled work tasks.  (R. 478-80).  The ALJ decided not to give the treating doctor's report controlling or great weight because it conflicted with Dr. Anwar's own treatment notes and the other medical opinions in the record.  She also noted that GAF scores from the Ecker Center where Dr. Anwar saw Plaintiff ranged from 50 to 60.  (R. 36).

The Court finds both parties' arguments on this issue inconclusive. The Commissioner points to five parts of the record to support the ALJ's belief that Dr. Anwar understated Barnes' GAF scores.  None of them are directly relevant to the issue.  Two of

the Commissioner's cites refer to the ALJ's decision itself. (R. 36, 32-34). The decision is not substantial evidence for its own conclusions. The third cite does not contain a GAF score. (R. 399-401). The fourth contains a GAF assessment of 55. (R. 409). That is not evidence that contradicts Dr. Anwar. Instead, this assessment was given by a social worker on December 13, 2010. Dr. Anwar is a psychiatrist who gave his statement on January 26, 2012. Dr. Anwar only referred to Barnes' former GAF scores within the 12-month period before that date. The social worker's score of 55 is outside that period. The Commissioner's last cite contains a GAF score of 60 given by Dr. Jagodic on January 11, 2011. (R. 211). That is also outside the one-year period referenced by Dr. Anwar. The ALJ herself never specifically referred to the record for a GAF score. Thus neither the ALJ nor the Commissioner has cited a single GAF assessment that contradicts Dr. Anwar's statement.

The Court notes on its own that such scores do exist. Even if the ALJ had correctly cited them, she needed to explain more carefully why they discredited Dr. Anwar's report. GAF scores often fluctuate. *Hunt*, 889 F. Supp.2d at 1146. They are also more probative for assessing treatment options than determining functional capacity and a person's disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Even a score of 60 can be insufficient for discounting a bipolar claimant's "marked" limitations under certain conditions. *See Sambrooks v. Colvin*, 566 Fed.Appx. 506, 511 (7th Cir. 2014). A slightly lower score of 58 "suggests someone who may be barely above the level of being able to work or live independently." *Goble v. Astrue*, 385 Fed.Appx. 588, 594 (7th Cir. 2010). As noted, the ALJ cited a score of 50. She should have been aware, however, that a "GAF rating of 50 does not represent functioning within normal limits. Nor does it support a

conclusion that [a claimant] was mentally capable of sustaining work." *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010). The ALJ might have had reason for relying on GAF scores to dispute Dr. Anwar's opinion. But she could not do so by failing to identify any relevant conflicting scores, and by not explaining her reasons in light of Barnes' bipolar disorder.

The ALJ did not discuss what Ecker Center records she thought contradicted Dr. Anwar. Barnes claims this is reversible error in itself. That can be true under some circumstances. In this case, however, the treatment notes are not always as dire as Plaintiff claims. The Court declines to discuss the issue further at this stage because the Commissioner has made little or no effort to defend the ALJ on this point. The government has not cited any specific Ecker Center records, choosing instead to make broad generalizations.

The ALJ thought that Dr. Anwar's report conflicted "with other opinions in the file." (R. 36). The Commissioner correctly states that an ALJ can deny controlling weight to a treating physician when his report is at odds with a consulting physician. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). That is not what the ALJ said, however. She only referred vaguely to "other" opinions. There are numerous opinions in the record given by both consulting and non-examining state-agency physicians. The rule cited by the Commissioner does not apply to state-agency physicians, at least under all circumstances. Neither the Commissioner nor the ALJ points to the consulting physicians that were used to deny controlling weight to Dr. Anwar. Once more, the Court will not do so on their behalf.

The Seventh Circuit has characterized the standard that applies to this issue as

"lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Since this case already requires remand, the Court will not decide at this stage if substantial evidence supports the treating physician standard. Instead, the ALJ is instructed to state her reasoning more clearly. She should consider the opinion of Dr. Jagodic, who may also have been a treating source. The ALJ should also consider the January 17, 2011 Comprehensive Mental Health Assessment issued by Sandy Elder, M.A., QMHP and Caroline Bailey, MSW, LPHA. ALJ LaRiccia overlooked this evaluation entirely. These mental health professionals may or may not have been "acceptable medical sources" under SSR 06-3p. *See N.B. v. Hamos*, 26 F. Supp.3d 756, 767 n.7 (N.D. Ill. 2014). That is for the ALJ to decide. Even if they were not, she was still "obligated to apply the same criteria to [them] that are used to weigh the opinion of a treating physician." *Pontarelli v. Colvin*, 2014 WL 3056616, at *6 (N.D. Ill. July 7, 2014). Social Security Ruling 06-3p instructs ALJs to consider "all of the available evidence in the individual's case record," including the opinions of "other 'non-medical sources.'"

The ALJ should also clarify the balance that she struck between Dr. Anwar's opinion and the those of the state-agency physicians. The ALJ said that she gave "some" weight to the non-examining doctors. (R. 35). She never assigned a specific weight to Dr. Anwar. An ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion." SSR 96-2p. *See also Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008) (stating that an ALJ must clearly state the weight she has given to the medical sources and the reasons that support the decision); *David v. Barnhart*, 446 F. Supp.2d 860, 871 (N.D. Ill. 2006) ("The weight

given to a treating physician cannot be implied[.]").  If the ALJ thought that Dr. Anwar deserved less than "some" weight she should have said so.  Merely stating that he was not entitled to controlling or great weight fails to explain why the treating psychiatrist – who was far more familiar with Barnes' functioning than any of the non-examining sources – was less credible than the state-agency physicians were.

C.    **The RFC Issue**

As noted above, the ALJ restricted Barnes to light work that involved "simple routine tasks with non-collaborative interaction with coworkers, superficial contact with the general public, and occasional interactions with supervisors."  (R. 29).  The ALJ's hypothetical question to the VE mirrored these restrictions.  (R. 74). Barnes argues that the ALJ's citation to "simple routine tasks" was insufficient to account for his moderate restrictions in concentration, persistence, and pace.  The Commissioner claims that the use of these terms was not erroneous because, like the ALJ, the state-agency physician Dr. Brister also found that Plaintiff had moderate restrictions in the functional area.  Dr. Brister's mental RFC assessment concluded that Barnes could carry out "simple operations of a routine and unskilled nature."  (R. 379).  The Commissioner contends that the medical expert's statement on this issue was sufficient for the ALJ to fashion the RFC as she did.

The Court respectfully disagrees with the Commissioner.  Both parties cite the Seventh Circuit's opinion in *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010).  The Seventh Circuit found that a hypothetical must account for the totality of a claimant's limitations.  "In most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence, and pace."  *Id*. at 620.  Several

17

exceptions apply. One involves the scenario in which it is clear that the VE independently reviewed the medical record or heard testimony that directly addressed the claimant's limitations. The Commissioner does not argue that is the case here. No medical expert appeared at the hearing to testify.

That leaves the second major exception. An ALJ may omit a reference to concentration and pace "when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id*. at 619. The Commissioner has not addressed why that is the case here. The government relies almost exclusively on the fact that non-examining physician Dr. Brister translated Barnes' moderate limitations into simple and routine tasks. That focuses on the relation between the ALJ and the state-agency physician. By contrast, *O'Connor-Spinner* focuses on the relation between the ALJ's hypothetical question and the VE. When the ALJ does not explicitly reference concentration, persistence, and pace, the critical issue is if the ALJ's question was sufficient to alert the VE that she must exclude jobs that the claimant could not perform.

The Commissioner does not address the critical issue of what the VE in this case could have reasonably inferred from the ALJ's question. The Commissioner claims that it is significant that the RFC and hypothetical question went on to identify limitations concerning Barnes's capacity to interact with co-workers and the public. Those limitations, however, stem from Barnes' moderate restrictions in social functioning. If anything, the ALJ's additional mental restrictions drew attention away from Barnes' problems in concentration, persistence, and pace and redirected them towards social limitations. That undercuts, rather than strengthens, the possibility that the ALJ sufficiently alerted the VE

to exclude jobs that exceeded Barnes' limited ability to concentrate and remember.

The Commissioner claims that this case is like *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002). The Seventh Circuit cited that case in *O'Connor-Spinner* to distinguish between adequate and erroneous RFCs. The government overlooks that *O'Connor-Spinner* noted that most of the cases in which an ALJ permissibly fails to refer to concentration and pace are – like *Johansen* – those that involve stress and panic-related conditions. In *Johansen* the ALJ relied on an expert mental RFC stating that the claimant's moderate restrictions in concentration and pace would allow him to perform "repetitive, low-stress work." *Id*. at 285. The ALJ translated that into a hypothetical question that asked the VE what jobs were available to a person who could carry out repetitive, low-stress work. The Seventh Circuit found that acceptable because the ALJ's stress-related restriction alerted the VE to exclude jobs that could "trigger symptoms of the panic disorder that lay at the root of the claimant's moderate limitations in concentration, persistence, and pace." *O-Connor-Spinner*, 627 F.3d at 619.

That is not the case here. Contrary to the Commissioner's claim, the ALJ did not adopt all of what Dr. Brister's RFC included. The state-agency physician was very clear that simple, repetitive jobs (which also included "unskilled" work)[2] were meant to address

---

[2] The ALJ did not include this limitation in the RFC. She should clarify on remand if she intended to adopt Dr. Brister's restriction to unskilled work. "Routine" and "simple" work is not necessarily the same as "unskilled" work. *See Lucy v. Chater*, 113 F.3d 906, 909 (8th Cir. 1997). 20 C.F.R. § 404.1568 defines unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." *See also Vuxta v. Comm. of Soc. Sec.*, 194 Fed.Appx. 874, 878 (11th Cir. 2006) (per curiam) ("[A] limitation to simple tasks is already contained within the unskilled limitation, and is not a limitation above and beyond that classification. A limitation to repetitive tasks, however, is not contained within the definition of unskilled."). The Court does not imply that the ALJ erred. Since the case requires remand, however, she should clarify the ambiguity

Barnes' ability to "understand, recall and execute" work tasks. (R. 379). That is, Dr. Brister was explicitly concerned with Plaintiff's limitations in memory and comprehension. The ALJ's RFC did not include this additional language. Thus it did not put the VE on notice that Barnes should be restricted from jobs where he might have difficulty in learning or recalling the tasks that would be part of such work.

This runs counter to the basic holding of *O-Connor-Spinner*. Much of the Seventh Circuit's reasoning was based on the presumption that "[t]he ability to stick with a given task over a sustained period is not the same as the ability *to learn how to do tasks of a given complexity*." *Id*. (emphasis added). *O-Connor-Spinner* noted that SSR 85-15 states that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." ALJ LaRiccia did not tell the VE to account for all of limitations in learning and memory that were part of Dr. Brister's RFC. Thus the Commissioner's basic premise that the ALJ adopted the state-agency physician's findings is not true. Indeed, she never referred to Dr. Brister at all. *See Stanifer v. Colvin*, 2015 WL 437773, at *11 (N.D. Ind. Feb. 3, 2015) ("Here, the ALJ committed error by not explaining what evidence supported her belief that [claimant] was able to complete tasks, even if repetitive and simple, over a *sustained* period of time at a *competitive pace*.").

Barnes also claims that the ALJ failed to discuss her reasons for the physical RFC, particularly as it involved his morbid obesity. The ALJ noted that Barnes weighed 387 pounds at a recent exam. She said that she "considered" his obesity under the guidelines

---

concerning what it was in Dr. Brister's RFC that she adopted.

of SSR 02-1p as part of the RFC. SSR 02-1p requires an ALJ to assess the "effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time." That is particularly true when, as here, a claimant has obesity in combination with other limiting impairments such as neuropathy and arthritis. The ALJ clearly did not follow this directive. She provided no explanation at all of her conclusion.

The Commissioner claims that substantial evidence still supports the RFC because the ALJ considered a December 2010 consultation report of Dr. Mahesh Shah. That is not altogether persuasive. Dr. Shah identified various exertional and strength findings concerning Barnes' ability to sit and move. He also recognized that Barnes was morbidly obese. Dr. Barnes acknowledged that the obesity "can make the [other] problems worse." (R. 337). However, he never explained what the combined effect would be. The ALJ was also silent on the issue. Social Security Ruling 92-1p places great emphasis on the fact that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." The ALJ never said whether obesity had any effect on Barnes' other limitations. That was erroneous. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) ("If the ALJ thought that [claimant's] obesity has not resulted in limitations on her ability to work, he should have explained how he reached that conclusion.").

That can be harmless error when an ALJ adopts the limitations stated by a physician who was aware of the obesity issue. *Id*. Dr. Julio Pardo issued a physical RFC in January 2011 that listed morbid obesity as Barnes' primary condition. (R. 369-74). As noted above, however, the ALJ never identified any of the state-agency reports. She merely

referred in general terms to them and gave them all "some" weight without distinguishing between them.  In addition, it is not clear that Dr. Pardo considered Barnes' arthritis.  His report does not mention it, even though the ALJ went on to find that it was a severe impairment at Step 2.

Even if the harmless error rule applies to the physical RFC, this case already requires remand on credibility and the mental RFC.  The ALJ should explain more carefully how she considered the effects of his morbid obesity.  That includes accounting for what Barnes told her at the hearing.  He said that his knee pain could become so bad at times that he needed to use crutches to walk.  The ALJ referenced that statement, as well as Plaintiff's testimony that he needs to use a cart to get through a grocery store.  However, the ALJ never said anything about the credibility of these statements.  She should explain more carefully why the combined effects of Barnes' neuropathy, arthritis, and obesity permit him to perform light work in a sustained manner. She should also state more carefully what weight she gave to Dr. Pardo's report if that was what the ALJ intended to rely on to substitute for her obesity analysis.

### III.   Conclusion

Plaintiff George Barnes' Motion for Summary Judgment [18] is granted, and the Commissioner's Motion for Summary Judgment [25] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

ENTER:

_____
Daniel G. Martin
United States Magistrate Judge

DATE: February 23, 2015.